Filed 5/3/23  P. v. Standley CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>CURTIS STANDLEY,<br><br>          Defendant and Appellant. | A164578<br><br>(Alameda County<br>Super. Ct. No. 17CR027648) |

On September 17, 2017, defendant Curtis Standley picked up a bike belonging to Jason Coleman off the sidewalk in Oakland and began to ride away on it.  When Coleman and other witnesses attempted to stop him, Standley shot Coleman in the chest, killing him.  A jury convicted Standley of second-degree murder and being a felon in possession of a firearm, and the trial court sentenced him to a term of 28 years to life.  Standley appeals, arguing that instructing the jury with CALCRIM No. 3472 limited his right to argue the shooting was in self-defense, that the prosecutor committed various types of misconduct in her closing argument, and that the jury should have been permitted to consider a hearsay statement made by one witness to the Oakland police for its truth.  We affirm.

1

## BACKGROUND[1]

On the morning of September 14, 2017, Standley was walking under a freeway overpass on 42nd Street between Martin Luther King and Telegraph Avenue in Oakland. Standley picked up a bicycle from the sidewalk that belonged to Jason Coleman, who lived nearby in a "cave" in a pillar supporting the overpass. Standley then got onto the bike and began to pedal away toward Telegraph Avenue.

Coleman, along with several other witnesses, began chasing Standley. As they were chasing him, Standley fell off the bike. Standley pulled out a gun, pointed it at one witness, and told him to "Back the fuck up." The various witnesses at trial gave slightly different accounts of what followed, but all agreed that shortly thereafter, Standley shot Coleman in the chest and then ran away toward Telegraph Avenue.

Coleman later died of a single gunshot wound to the chest.

On August 2, 2018, an information was filed charging Standley with Coleman's murder (Pen. Code, § 187, subd. (a))[2] (count 1), with enhancement allegations that he had personally used a firearm (§§ 12022.5, subd. (a) & 12022.53, subds. (b), (c), (d) & (g)) and caused great bodily injury (§ 12022.7, subd. (a)); and with possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 2). The information alleged that Standley had two prior felony convictions (§ 667.5, subd. (b)) and was on probation at the time of the incident (§ 1203, subd. (k)).

Trial took place over seven court days in November and December of 2021. The prosecution argued that Standley was guilty of first-degree

---

[1] We provide the factual and procedural background only as necessary to decide the issues on appeal.

[2] Further undesignated statutory references are to the Penal Code.

murder under a theory of felony murder because he had committed the murder during the course of a robbery.

Standley testified in his own defense. He admitted having shot Coleman, but denied having aimed the gun at him. He testified that he shot Coleman because he was afraid of Coleman getting the gun and killing him with it, and "just reacted." Standley also testified about his drug use and his extensive history of experiencing violence, and offered the expert testimony of a clinical and forensic psychologist who opined that Standley suffered from "complex trauma," which makes sufferers highly reactive and hypervigilant.

On December 13, the second day of deliberations, the jury found Standley not guilty of first-degree murder, but guilty of second-degree murder and possession of a firearm by a felon, and found the various enhancement allegations true.

On February 7, 2022, the trial court sentenced Standley to a term of 28 years to life, consisting of 15 years to life on count 1, plus a 10-year firearm enhancement (§ 12022.53, subd. (b)), and the upper term of three years on count 2.

Standley filed a notice of appeal.

## DISCUSSION

Standley argues that (1) the trial court improperly restricted his right to claim self-defense by instructing the jury with CALCRIM No. 3472; (2) the prosecutor committed misconduct in closing argument by misstating the law of murder and malice and by appealing to the jury's passion or prejudice; and (3) the trial court erred in instructing the jury pursuant to CALCRIM No. 319 that a statement by Linda Hyde to the Oakland police on the day of the incident could not be considered for its truth.

3

**The Trial Court Did Not Commit Reversible Error In Giving CALCRIM No. 3472**

**Additional Background**

At the jury instruction conference, the prosecution requested CALCRIM No. 3472, which provides: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Defense counsel objected, and the trial court noted the objection but indicated it would give the instruction. The jury was also instructed, as part of CALCRIM No. 200, that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

**Analysis**

Standley argues that it was error to give CALCRIM No. 3472 because it was not supported by the evidence.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.) ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably

susceptible to such interpretation.' (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Several cases have rejected Standley's argument, finding that giving CALCRIM No. 3472—or the substantively similar CALJIC No. 5.55[3]—was not reversible error even if not supported by the evidence because we assume that the jury disregards instructions that it finds inapplicable. (See, e.g., *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278 [assertion "that no substantial evidence supported [CALCRIM No. 3472] does not warrant our finding reversible error because the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application"]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381 [no reversible error in giving CALJIC No. 5.55 where certain self-defense instructions were mutually exclusive and jury was instructed to " '[d]isregard any instruction which applies to facts determined by you to not exist' "]; *People v. Crandell* (1988) 46 Cal.3d 833, 872–873, abrogated on another ground in *People v. Crayton* (2002) 28 Cal.4th 346 [similar].) We likewise conclude that even if no substantial evidence supported giving CALCRIM No. 3472 as Standley contends, doing so was not reversible error.

The primary case relied on by Standley, *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), is inapposite. In *Ramirez*, defendants were gang members who provoked a group of rival gang members and started a fistfight. (*Id.* at pp. 944–945.) One defendant testified that he saw a rival gang member raise a black object that " 'looked like a gun,' " so that

---

[3] "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

defendant pulled out his own gun and fatally shot him. (*Id.*, at p. 945) The trial court instructed the jury with CALCRIM No. 3472 and the prosecutor argued in closing that the instruction "precluded any claim of self-defense even if defendants only instigated a fistfight" while acknowledging that "the evidence reflected a fistfight as defendants' likely intent." (*Ramirez, supra* 233 Cal.App.4th at pp. 945–947.) Under these circumstances, *Ramirez* concluded that "the instructions and the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense." (*Id.* at p. 953.) *Ramirez* is plainly distinguishable from the situation here, where Standley contends there is no evidence he provoked the confrontation with the intention to use either deadly or non-deadly force.

**The Prosecutor Did Not Commit Prejudicial Misconduct In Closing Argument**

Standley argues that the prosecutor committed misconduct by repeatedly misstating the law of murder during closing argument. In particular, Standley identifies five instances where the prosecutor told the jury that a finding of malice meant that the defendant was guilty of second-degree murder. Standley argues that the prosecutor "urged the jury to find malice without regard to the prosecutor's burden to prove that even an intentional killing is not automatically murder unless it was not legally justified."

Standley also argues that the prosecutor committed misconduct by appealing to jury's sympathy, passion, or prejudice and improperly asking it to send a message with a guilty verdict by telling the jury that " 'self-defense is . . . a free pass to killing someone' " and, later on, "what is being asked by the defense is that a person can walk around Oakland with a gun and bully

6

people for their property. . . . And then inevitably the victim stands up for themselves and tries to get their property back, they get to be shot by the person that stole their property.  That would create absolute chaos."

**Additional Background**

We begin by providing the context of the prosecutor's closing, including her statements regarding malice, with the portions Standley alleges constituted misconduct in italics.

Toward the beginning of her argument, the prosecutor discussed the law of murder:

"So I want to go straight to the point and I want to talk to you about the law of homicide.  There's a lot of moving parts with the law of homicide, so I want to break it down to sort of its simplest form so you all can understand what it entails.

"But homicide in general is just the killing of one human being by another.  There are lawful killings and there are unlawful killings.  Examples of lawful killings are things like a hunting accident, or if someone is killed during a time of war and one soldier kills another soldier.  Those are things that are lawful killings.  We are here for a murder, which is an unlawful killing.

"Murder, this is how it's broken down, but I will sort of paraphrase that.  There are three things that need to be proved in order to find murder: That a person was killed; that the person was killed with malice forethought; and that the killing was not justified; and the killing was unlawful.  So there was no justification for the killing whatsoever.  Those are the three things that sort of break down murder that need to be proved.

"And murder has two degrees:  First degree and second degree murder. I will get into that a little bit more when I talk about felony murder, but *just*

*know that when there is a dead body on the ground at the hands of another*
*person, you start with second degree murder.*

"MS. BELES [defense counsel]: Objection. Misstates the law.

"THE COURT: Ladies and gentlemen, to the extent that the attorneys' comments differ from the instructions that I gave you already and the instructions you'll have in deliberations, just follow my instructions and disregard counsels' argument."

In discussing implied malice, the prosecutor later explained:

"Another example that's very typical is a DUI that kills someone. Everybody knows and everybody understands that driving while under the influence is incredibly dangerous, and that in fact doing so can kill someone if you hit them. If you are unable to operate a motor vehicle and you still do it and you kill someone, that's implied malice.

"So those are examples of what implied malice are.

"And 'aforethought' just means before. It doesn't mean deliberation. It doesn't mean premeditated, nothing like that. It just means before. So you have to have malice before.

"*And once you find that there is malice, you have found that there is murder.*

"MS. BELES: Objection. Misstates the law.

"THE COURT: Ladies and gentlemen, again, as the attorneys discuss the law, they may misstate the law. It may be in conflict to the instructions that I give you. To the extent that occurs, you must follow the instructions that I give you."

In discussing the evidence of Standley's intent to kill:

"On top of that, Mr. Standley at no point has any interaction with Jason. There's no verbal argument, there's no tussle over the bike. Jason at

no point physically touches Mr. Standley. There's no threats from Jason to Mr. Standley. Jason has no weapon. All of those things as well demonstrate an intent to kill. Shooting an unarmed person demonstrates intent to kill.

"So there is express malice in this case demonstrated from the testimony that you have heard on the witness stand.

"So I have argued that there is intent to kill in this case, and that the evidence shows that there was intent to kill in this case, but there is also implied malice in this case. *And I just told you if you find malice, whether express or implied, that you find a murder.*

"MS. BELES: And I object again as misstates the law.

"THE COURT: So you'll have a chance to make a closing argument as well."

The prosecutor argued that there was no evidence that Standley acted in self-defense:

"I'm going to take a very brief time with you and discuss with you that this case is not self-defense. I have to prove that there was no justification for Mr. Standley shooting Jason Coleman. And I want you guys when you're back in the deliberation room to take a look at that self-defense instruction. *Because what self-defense is is a free pass to killing someone.* So society and the law makes that standard very high. It makes it so that somebody can't shoot someone and then just say self-defense. There are things that have to be present in order for self-defense to be validly claimed.

"And I will just tell you the belief, Mr. Standley's belief, was not reasonable. Mr. Standley didn't even testify to imminent danger. In addition, there was no danger of great bodily injury or death. And on top of that, the force used was not reasonable force.

9

"These are just some of the things that have to be present in order for self-defense to be a legitimate claim and to be a legal claim that you can use in order to negate killing someone. None of these things are present in what Mr. Standley said. So self-defense cannot be claimed. There is no self-defense in this case.

"*Like I said, once you all have agreed that there is malice, whether express or implied, you have found a second degree murder.*

"MS. BELES: I object again, your Honor. If the Court wants to make it a standing objection, then I will take that."

After a discussion off the record:

"THE COURT: All right. So I'm going to consider this a standing objection for the purposes of our record.

"And again, ladies and gentlemen, if the comments of counsel concerning the law differ from my instructions, follow my instructions.

"Miss Clay.

"MS. CLAY [prosecutor]: Thank you.

"*Once you have found malice and a second degree murder, you then have to decide whether the murder stays at a second degree murder or is elevated to a first degree.*"

Later on, in discussing Standley's testimony and credibility as part of her rebuttal argument, the prosecutor said the following:

"How many stories does a person have to tell for someone, anyone, to say I don't believe anything that's coming out of this person's mouth? In my personal opinion, I would say one story, one story is enough. But Mr. Standley gave you at least seven, including the one that he gave you on the stand. And you heard what those were: I wasn't in the area; I didn't have a gun; I was on my bike; I had two bikes; they beat me up; he shot

10

himself. How many stories does Mr. Standley have to give in order for what he said to be completely disregarded?

"He is so comfortable lying when it benefits him. And there is no difference, zero difference between Mr. Standley lying to the police and Mr. Standley lying to you in this courtroom. Because the goal is exactly the same, to get away with murder.

"*Essentially what is being asked by the defense is that a person can walk around Oakland with a gun and bully people for their property—*

"MS. BELES: Objection. Calls for public outcry. I can't think of the word.

"THE COURT: Ladies and gentlemen, you're not to decide this case based on political passions or inflammatory rhetoric. You must determine this case on the evidence presented and the legal instructions. The attorneys sometimes will make arguments to try to emphasize a specific point.

"Go ahead, Miss Clay.

"MS. CLAY: Thank you.

"*And then inevitably the victim stands up for themselves and tries to get their property back, they get to be shot by the person that stole their property. That would create absolute chaos.*

"MS. BELES: Your Honor, I object.

"THE COURT: All right. This trial's not about sending a message. The trial is about whether the case can be proven beyond a reasonable doubt by the People. So please conform your remarks to those subjects, Miss Clay.

"MS. CLAY: This is exactly what happened in this case, the case against Mr. Standley. Jason Coleman stood up to Mr. Standley after he stole his bike and he was shot. That is exactly what happened, and now he's trying self-defense because the victim wanted to get their property back,

11

which is a completely reasonable reaction for anybody whose items are stolen."

**Applicable Law**

"A prosecutor's conduct ' "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citation.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. " ' " ' (*People v. Rhoades* (2019) 8 Cal.5th 393, 418.) Under state law, 'bad faith on the prosecutor's part is not required.' (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)" (*People v. Zarazua* (2022) 85 Cal.App.5th 639, 644.)

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 702 (*Mendoza*).) However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' (*People v. Marshall* (1996) 13 Cal.4th 799, 831 (*Marshall*); accord, *People v. Hill* (1998) 17 Cal.4th 800, 829 (*Hill*).) To establish such error, bad faith on the prosecutor's part is not required. (*Hill*, at pp. 822–823.) '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' (*Id*. at p. 823, fn. 1.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions'

12

(*Marshall*, *supra*, 13 Cal.4th at p. 831), there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)" (*People v. Centeno*, *supra*, 60 Cal.4th at pp. 666–667.)

"It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial." (*People v. Fields* (1983) 35 Cal.3d 329, 362–363.)

" '[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [Citation.]' (*People v. Crew* (2003) 31 Cal.4th 822, 839." (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

**Analysis**

Viewed in "the context of the whole argument and the instructions" (*Marshall*, *supra*, 13 Cal.4th at p. 831), we do not agree that the prosecutor's comments were a misstatement of the law, and certainly not prejudicial misconduct. Immediately before the first alleged misstatement, the prosecutor explained the third element of murder, "that the killing was not justified; and the killing was unlawful." (See CALCRIM No. 520 [first or second degree murder requires defendant "killed without lawful excuse or justification"].) Just before the third and fourth alleged misstatements, the prosecutor discussed self-defense and the burden of proof on that issue for three paragraphs of the transcript, telling the jury quite clearly that "*I have to prove* that there was no justification for Mr. Standley shooting Jason

13

Coleman" and arguing that the testimony at trial satisfied that burden. Viewing the prosecutor's closing argument as a whole, we do not agree that she misstated the law of malice or self-defense, nor that she misrepresented the prosecution's burden of proof on those issues.

With respect to the prosecutor's statement that "self-defense is a free pass to killing someone," Standley's argument of error is waived by failure to object and request an admonition. (See *People v. Tully*, *supra*, 54 Cal.4th at p. 1010.) In any event, we do not agree that the statement constituted misconduct. As the balance of the paragraph makes clear, the prosecutor was simply emphasizing that because self-defense justifies what would otherwise be a murder, "the standard is very high" and there are numerous legal requirements to establish it. We do not agree that this was an improper attempt to appeal to the sympathy or passions of the jury.

Furthermore, to the extent there was any prosecutorial misconduct, any resulting prejudice was cured by the court's admonitions to the jury. Defense counsel objected to each of the alleged misstatements of the law, and the court told the jury three separate times that counsel "may misstate the law," and that to the extent counsel's comments were in conflict with the court's instructions, the jury should follow the instructions. The court's written and oral instructions accurately stated the law of murder, malice, and self-defense, and Standley does not contend otherwise. And after the statements that allegedly attempted to appeal to the jury's sympathy or passions or asked them to send a message, the trial court admonished the jury "not to decide this case based on political passions or inflammatory rhetoric," and "[t]his trial's not about sending a message," emphasizing that they should "determine this case on the evidence presented and the legal

14

instructions" and "[t]he trial is about whether the case can be proven beyond a reasonable doubt by the People."[4]

We "must presume jurors follow instructions and obey admonitions." (*People v. Hem* (2019) 31 Cal.App.5th 218, 230; see *People v. Vang* (2009) 171 Cal.App.4th 1120, 1129; *People v. Zack* (1986) 184 Cal.App.3d 409, 416.) "[P]rosecutorial misconduct is ordinarily presumed to be cured by a proper admonition," *People v. Green* (1980) 27 Cal.3d 1, 30, abrogated on another ground by *People v. Martinez* (1999) 20 Cal.4th 225, 233–239, and in particular "[a] prosecutor's misstatements of law are generally curable by an admonition from the court.  (*People v. Bell* (1989) 49 Cal.3d 502, 548.)" (*People v. Centeno*, *supra*, 60 Cal.4th at p. 674.)   "It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' (*People v. Seiterle* (1963) 59 Cal.2d 703, 710.)" (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.)

Standley acknowledges the rule that that a proper admonition is generally sufficient to cure any potential prejudice from prosecutorial misconduct, but simply asserts, without citation to authority, that because the misconduct was "repeated" and the statements "went directly to the heart of a primary contested issue at trial," the error was not harmless beyond a reasonable doubt.  As discussed, we do not agree that the comments did anything to lighten the prosecution's burden of proof, and Standley has

---

[4] The jury was also instructed that "You must not let bias, prejudice or public opinion influence your assessment of the evidence or your decision. . . . You must follow the law as I explain it to you even if you disagree with it.  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

15

provided no reason to depart from the ordinary rule that a proper admonition is sufficient to cure any potential prejudice.

**There Was No Error in Instructing the Jury with CALCRIM No. 319**

### Additional Background

Linda Hyde witnessed the incident and made a recorded statement to police on the day it took place, and later testified at the preliminary hearing. During motions in limine, defense counsel stipulated that Hyde had died after the preliminary hearing, and the parties agreed that her preliminary hearing testimony could be read to the jury. At trial, the court explained to the jury that Hyde was deceased, that she had testified at the preliminary hearing in July of 2018, and that her testimony would be read to them.

On direct examination at the preliminary hearing, Hyde testified, in relevant part, that on September 14, 2017, at around 11:15 a.m., she was in her van, which was parked under the overpass "across from where [Coleman] stayed." She saw someone "walking on the left-hand side of the sidewalk and he jumped on Jason's bicycle and was riding off." Coleman "went running after his bicycle." Coleman "grabbed the tail end of his cart on his bicycle" and Standley then "jumped off the bicycle, turned around in the middle of the street and shot him." She estimated that Standley was "[a]bout 10 feet away, give or take" from Coleman when he shot him. After the shooting, Standley "turned around and took off going towards Telegraph" on foot. Because she was disabled, Hyde could not get out of her van, but she testified that she "was seeing everything."

Defense counsel questioned Hyde regarding prior statements she had made to police after the shooting as follows:

16

"Q. Okay. Did you give a statement to any police officers after the— did you give a statement to any police officers ever about this?

"A. Yes.

"Q. Who did you speak to, if you know?

"A. Oakland Police Department.

"Q. And you gave how many statements?

"A. I gave one at the scene, and then I went to the—after they realized [Mr. Coleman] was dead, I went down to the homicide and gave one to the homicide.

"Q. Okay. So you gave a relatively brief statement at the scene of the incident, correct?

"A. Yes, sir.

"Q. And did you tell the truth completely at that time?

"A. Yes, sir, to the best of my knowledge.

"Q. Okay. And then you went down to OPD homicide and gave a more complete statement?

"A. Yes, sir.

"Q. And that was—did you know if that was being taped or not?

"A. I believe so. They notified me.

"Q. And they told you this is recorded?

"A. Yes.

"Q. And did you tell the complete truth at that time?

"A. Yes, sir."

As part of the defense case at trial, Officer Michael Jaeger testified that he interviewed Hyde on September 14, 2017 at the Oakland Police Department. A videotape of the interview was played for the jury. During the interview, Hyde said she saw Coleman "running after" the bicycle, and "I

looked up and that's when Jason had caught his bicycle and the guy in the red shoes and backpack jumped off and turned around, and this part I didn't see, because they had moved up by the camper." She added that Standley and Coleman "had moved too far up for me to actually have visual on them" and "I didn't actually see [Standley] shoot the guy."

At the jury instruction conference, the prosecution requested CALCRIM No. 319, telling the jury that they could consider Hyde's statement to Detective Jaeger only in deciding whether to believe Hyde's testimony, and not for any other reason. Defense counsel objected, and argued that because Hyde had been confronted with her statements to Detective Jaeger at the preliminary hearing, they could be considered for their truth. The trial court disagreed: "I think the idea that the witness has been confronted with their prior statement and giving them some ability to explain the differences between their current testimony and their earlier statement, just saying when you spoke to the police did you tell the truth, that didn't really give Miss Hyde a chance to explain any specific differences. So I don't think—she was confronted with a prior inconsistent statement. So I think 319, I will be giving both of those paragraphs."

And so the jury was instructed:

"Linda Hyde did not testify in this trial, but her testimony, taken at another time, was read for you. In addition to this testimony, you have heard evidence that Linda Hyde made another statement. I am referring here to the statement about which Detective Jaeger testified.

"If you conclude that Linda Hyde made that other statement, you may only consider it in a limited way. You may only use it in deciding whether to believe the testimony of Linda Hyde that was read here at the trial. You may

18

not use that other statement as proof that the information contained in it is true, nor may you use it for any other reason."

**Analysis**

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (*Id.*, subd. (b).) " '[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception.' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)" (*People v. Chhoun* (2021) 11 Cal.5th 1, 44.)

Under Evidence Code section 1235, "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770." Under Evidence Code section 770, "[u]nless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

"(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or

"(b) The witness has not been excused from giving further testimony in the action."

"Prior inconsistent statements admitted under Evidence Code section 1235 may be considered for their truth as well as for impeachment." (*People v. Chhoun, supra*, 11 Cal.5th at p. 44.)

In his opening brief, Standley argues, without elaboration, citation to the record, or authority, that "because Hyde had the opportunity to explain the differences between her testimony and her statement to officers on the

19

day of the incident, there was no confrontation issue requiring that her statement to [Detective] Jaeger be excluded for its truth." To the contrary, the trial court did not abuse its discretion in concluding that Hyde was not "so examined while testifying as to give [her] an opportunity to explain or deny the statement." As our esteemed colleague Justice Simons explains:

"A party may introduce an inconsistent statement if the witness was given 'an opportunity to explain or to deny the statement.' (Evid. Code, § 770, subd. (a).) Few cases have defined that phrase. One court held that providing a witness with a 60–page deposition transcript taken 18 months earlier and asking him, 'Now, at that time and place, were all of these questions asked and all of these answers given?' was insufficient because it did not provide 'a realistic opportunity to explain or deny any specific statement contained therein.' (*Bossi v. State of California* (1981) 119 Cal.App.3d 313, 325.) Another court held that a realistic opportunity to explain or deny the prior statement requires reference to more than one of the following: (1) 'the people involved in the conversation'; (2) 'its time and place'; or (3) 'the specific statements that were made during it.' (*People v. Garcia* (1990) 224 Cal.App.3d 297, 304.) The *Garcia* court held that asking the witness, 'Did you ever tell anyone that unless Mr. G. gave you a certain amount of money, you would get him in trouble?' was an insufficient opportunity to explain or deny." (Simons, Cal. Evidence Manual (2023) § 2:42.)

Here, Hyde was simply asked whether she gave a statement to police on the day of the incident and whether she told the truth in that statement. She did not discuss the specific people involved in the conversation, and she was not asked about or confronted with any of her specific statements to Officer Jaeger, including her statements that Standley and Jason had "moved

20

too far up for me to actually have visual on them," or that she "didn't actually see [Standley] shoot the guy, shoot Jason," or how those statements could be consistent with her later testimony that she "was seeing everything" regarding the incident, and she therefore did not have any opportunity to "explain or deny" them. In fact, her statement to Officer Jaeger does not appear to have been introduced into evidence at all at the preliminary hearing. Contrary to Standley's assertion, Hyde did not have any opportunity to explain the differences between her testimony and her statement to officers on the day of the incident. There was no abuse of discretion in concluding that the statement could not be considered for its truth and that therefore the jury should be instructed with CALCRIM No. 319.

## DISPOSITION

The judgment is affirmed.

_____
Richman, Acting P.J.

We concur:

_____
Miller, J.

_____
Markman, J. *

*People v. Standley* (A164578)

     *Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.